IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN LAYER, on behalf of himself and similarly situated employees,<br>　　　　　　　　　　　　Plaintiff,<br>　　　v.<br><br>TRINITY HEALTH CORPORATION; MERCY HEALTH SYSTEM; and LOURDES HEALTH SYSTEM,<br>　　　　　　　　　　　　Defendants. | 2:18-cv-02358-TR |

**BRIEF IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION
FOR "FINAL APPROVAL" OF THE CLASS AND COLLECTIVE
ACTION SETTLEMENT AND OTHER RELATED RELIEF**

Plaintiff John Layer ("Plaintiff") respectfully submits this brief in support of his

"Unopposed Motion for Certification of the Settlement Class, Final Approval of the Class Action

Settlement, and Other Associated Relief." See Doc. 49. The settlement of this class/collective

action lawsuit with Defendants Trinity Health Corporation ("Trinity"), Mercy Health System of

Southeastern Pennsylvania[1] ("Mercy"), and Our Lady of Lourdes Health Care Services, Inc.[2]

("Lourdes") (collectively "Defendants") creates a settlement fund of $280,000 that, contingent

on Court approval, will be distributed as follows: (i) $173,500 will be paid to 78[3] current/former

employees covered by the settlement; (ii) $10,000 will be paid to Plaintiff as a service award;

(iii) $70,000 in attorney's fees will be awarded to the law firm of Winebrake & Santillo, LLC

("class counsel"); and (iv) $26,500 in litigation expenses to class counsel.

In May 2019, the Court issued an order "preliminarily" approving the settlement,

---

[1] Mercy Health System of Southeastern Pennsylvania was incorrectly identified in the Complaint as "Mercy Health System."

[2] Our Lady of Lourdes Health Care Services, Inc. was incorrectly identified in the Complaint as "Lourdes Health System."

[3] Two employees submitted timely exclusions from the settlement. See Doc. 48.

authorizing the issuance of notice to 80 current and former employees of Defendants (including

Plaintiff) covered by the settlement, and appointing the undersigned to serve as interim class

counsel.  See Doc. 47.  The notice process has concluded and zero class members have objected

to the settlement and only two individuals requested to be excluded.  See Doc. 48.

Thus, this matter is ripe for "final approval" at the October 23, 2019 fairness hearing.

Plaintiff submits this brief in support of his final approval motion, which asks the Court to enter

the accompanying proposed order:

- Certifying, pursuant to Civil Rules 23(a) and 23(b)(3), a settlement class consisting of the 78 individuals listed in Exhibit A (Doc. 49-1);

- Approving, pursuant to Civil Rile 23(e)(2), the settlement of this action as "fair, reasonable, and adequate;"

- Approving class members' waiver of their FLSA claims;

- Approving the payment of a $10,000 service award to Plaintiff;

- Appointing, pursuant to Civil Rule 23(g)(1), the law firm of Winebrake & Santillo, LLC to serve as class counsel;

- Approving, pursuant to Civil Rule 23(h), a payment from the settlement fund of $70,000 to compensate class counsel for reasonable attorney's fees; and

- Approving, pursuant to Civil Rule 23(h), a payment from the settlement fund of $26,500 to compensate class counsel for their expenses.

Such relief is warranted for the reasons discussed below:

## I.    LEGAL CLAIMS AND LITIGATION RISKS

### A.    Plaintiff's Legal Claims.

Defendants control and/or operate multiple medical facilities in the tri-state area.

Plaintiff is employed by Mercy as a "Medical Technologist/Medical Laboratory Technician" and

by Lourdes as a "Medical Technician."  See Complaint ("Cpl.") (Doc. 1) at ¶ 21.  Plaintiff is paid

an hourly wage and classified as non-exempt from federal and state overtime laws.  See id. at ¶

22.

During the relevant time period, Plaintiff sometimes worked during the same workweek at a Mercy RHM facility located in Philadelphia, PA (Mercy Philadelphia Hospital) and a Lourdes facility located in Camden, NJ (Our Lady of Lourdes Medical Center).  See id.  Plaintiff contends that, during such weeks, his overtime pay should have been based on his total, combined hours spent working at both RHM facilities.  See id. at ¶ 24 and Counts I-II. Defendants failed to do so.  See id.  Instead, Defendants only paid overtime premium compensation to Plaintiff if he exceeded 40 hours in a week at either Mercy Philadelphia Hospital RHM or Our Lady of Lourdes Medical Center RHM, not both.

The Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA") allow employees to receive overtime pay for hours worked over 40 per week.  See 29 U.S.C. § 207(a)(2); 43 P.S. § 333.104(c).  This obligation is modified for health care employers so that, under some circumstances, overtime pay is not due until the employee's hours exceed 80 in a 14-day period.  See 29 U.S.C. § 207(j); 43 P.S. § 333.104(c).

Plaintiff alleged in this lawsuit that Trinity, Mercy, and Lourdes were joint employers and violated the FLSA and PMWA when they failed to pay employees overtime pay based on the total combined number of hours worked at all RHMs during each workweek.  Specifically, Plaintiff alleged that Trinity controls a comprehensive integrated network that includes both Mercy and Lourdes, see Complaint (Doc. 1) at ¶¶ 10-12, that it has implemented a set of "Policies and Procedures" that applied to Plaintiff's work, see id. at ¶ 19, and that it maintained a "centralized payroll system" to determine Plaintiff's compensation, see id. at ¶ 20.  Similarly, Plaintiff alleged that Mercy and Lourdes were his joint employers because he worked for both of them at different times during some of the same workweeks, see Complaint (Doc. 1) at ¶¶ 22, 24,

and because Mercy and Lourdes were not "completely disassociated" and "may be deemed to share control of [Plaintiff], directly or indirectly, by reason of the fact that one employer is under common control with the other employer." See, e.g., id. at ¶¶ 10-12; see also 29 C.F.R. § 791.2(b) (DOL regulation addressing horizontal employment).

**B.      Defendants' Opposition to Plaintiff's Legal Claims.**

Defendants vigorously oppose Plaintiff's legal claims and asserts that its timekeeping and compensation practices complied with all applicable laws.  In this regard, the Court is referred to the following summary, which has been drafted by defense counsel:

As Plaintiff admits above, all of his FLSA and PMWA claims (as well as all the claims of the proposed collective/class) are fully contingent on a finding that Trinity and the RHMs are joint employers.  There is no allegation that Plaintiff (or any other employee) worked more than 40 hours per week at any of the individual RHMs and were not paid by the respective RHM at an overtime premium rate for hours worked over 40 in a work week.

There are two ways in which two or more employers can be found to be "joint employers" under the FLSA (and the PMWA which is interpreted co-extensively):  "vertical joint employment" (*e.g.*, where a parent and its subsidiary are joint employers) and "horizontal joint employment" (*e.g.*, where two "sister" corporations are joint employers).

To determine whether two employers constitute "horizontal joint employers" under the FLSA, courts apply the standards set forth in 29 C.F.R. § 791.2(b), which provides that:

> [w]here the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
> 1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
> 2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

In the Third Circuit, whether two employers are "vertical joint employers" is governed by the Third Circuit's decision in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 462, 468 (3d Cir. 2012) ("*Enterprise*").  The Third Circuit has adopted four key factors to determine whether a defendant exercises sufficient control to qualify as a joint employer.  They require the Court to consider whether the employer has:

1) authority to hire and fire the relevant employees;
2) authority to promulgate work rules and assignments and to set the employees' conditions of employment:  compensation, benefits, and work schedules, including the rate and method of payment;
3) involvement in day-to-day employee supervision, including employee discipline; and
4) control of employee records, such as payroll, insurance, or taxes.

*Id.* at 469.  Here, Plaintiff has claimed that Trinity is a "vertical joint employer" over the RHMs and that the RHMs are "horizontal joint employers."  However, it is Defendants' position that Plaintiff would be unable to demonstrate that Trinity and the RHMs are joint employers on either basis.

Specifically, as to the relationship between Trinity and the RHMs, Defendants argue that Plaintiff cannot prove the *Enterprise* factors above because Trinity does not have the authority to hire and fire the Plaintiff.  Moreover, even though during the relevant time period Trinity did indirectly supply certain admin1istrative services to the RHMs, such as the retirement plan and some policy materials, Trinity did not assign work to Plaintiff (or any of the employees at issue in this lawsuit), set their rate of compensation, set their work schedules, or determine their method of payment.  Trinity also is not involved in the day-to-day supervision of Plaintiff (or

any of the employees at issue in this lawsuit). Finally, while Trinity does maintain some employee records, such as payroll and tax information, this fact alone is insufficient to demonstrate that Trinity is a vertical joint employer over the RHMs.

It is also Defendants' position that Plaintiff would be unable to demonstrate that the RHMs are horizontal joint employers because his employment with one RHM is in no manner related to his employment with another RHM because there is no "arrangement" among the RHMs to "share" Plaintiff (or any of the employees at issue in this lawsuit), the RHMs act independently of one another, and Plaintiff's employment with one RHM is completely disassociated with his employment with any other RHM. More specifically, the RHMs do not have any overlapping officers, directors, or executives, and they do not share control over operations, such as hiring or firing. The RHMs do not jointly schedule Plaintiff (or any other employee at issue in this lawsuit), the Plaintiff's supervisors at each RHM are different and act completely independent of one another, and the RHMs do not treat Plaintiff and other employees as a pool of employees available to all RHMs. Finally, the RHMs maintain separate administrative operations and Plaintiff's work at one RHM does not simultaneously benefit any other RHM. Rather, named-plaintiff John Layer was separately hired by Mercy and Lourdes years apart. He was paid different rates of pay at Mercy and Lourdes, had different supervisors and managers and was scheduled separately.

Accordingly, Defendants argue that Plaintiff's FLSA and PMWA claims would fail because Plaintiff and the other 79 employees would be unable to demonstrate that Trinity and the RHMs are "joint employers."

As to any claim that Defendants may have willfully violated the FLSA, which would allow Plaintiff to extend the limitations period from 2 to 3 years, Defendants argue that such a

claim is also unsupported. To show willfulness, Plaintiff must meet the extremely high burden of showing that Defendants either: (1) knew; or (2) showed reckless disregard as to whether their conduct was prohibited by the FLSA. However, here, Plaintiff has no argument that Trinity (which had no corporate relationship with any of the RHMs until a merger in May of 2013) or the RHMs, knew that they were violating the FLSA or showed reckless disregard to their obligations under the FLSA. Plaintiff would be unable to come forward with any evidence that Trinity or the RHMs ever suspected that their actions might have violated the FLSA , or that they turned a blind eye in the face of any authority that would show they were somehow violating the FLSA. Accordingly, if the parties had not resolved this matter, Plaintiff's claim of willfulness would likely have failed.

As to Plaintiff's proposed PMWA class, the Complaint claims that "Defendants violated the PMWA by failing to pay overtime based on the combined hours that Plaintiff and other employees spent working for (i) Mercy [] or [St. Mary] and (ii) Lourdes [] or any other healthcare system, hospital, or facility owned or operated by Trinity or its subsidiaries." Compl. ¶ 41. However, and in addition to the fact that Plaintiff's PMWA claim would fail because Trinity and the RHMs are not joint employers under the PMWA for the reasons set forth above, Plaintiff's proposed PMWA claim also would fail, at least in part, to the extent that it seeks to recover damages on behalf of employees for hours that they worked outside of the Commonwealth of Pennsylvania at: Lourdes (which is solely located in New Jersey), St. Francis Medical Center ("St. Francis Trenton"), (which is solely located in New Jersey), and/or and St. Francis Hospital, Inc. ("St. Francis Delaware") (which is solely located in Delaware). The PMWA is inapplicable to, and Plaintiff and the other 79 employees may not recover under the PMWA, for hours worked outside of Pennsylvania. To allow New Jersey or Delaware

employees to seek payment of alleged unpaid overtime under the PMWA for work performed outside of Pennsylvania that benefited a non-Pennsylvania based employer is not supported by case law and would violate the U.S. Constitution's Commerce Clause prohibition that a state may not by its laws directly affect, bind, or operate upon property or persons beyond its territorial jurisdiction.  Accordingly, even if Plaintiff and the other 79 employees would have been successful as to their PMWA claim, only those employees who worked at both Mercy and St. Mary (*i.e.*, the only 2 RHMs located in Pennsylvania) are proper members of the putative PMWA class.

Accordingly, Plaintiff faces substantial litigation risks.

## II.    PROCEDURAL HISTORY AND SETTLEMENT

### A.    Procedural History.

On June 6, 2018, Plaintiff filed a complaint against Defendants alleging that they violated the FLSA and the PMWA by failing to pay overtime compensation based on the total combined hours worked at all RHMs during each workweek.  See generally Cpl. (Doc. 1).  The Complaint asserted class and collective action claims beginning on June 6, 2015, see id., in accordance with the PMWA's and FLSA's maximum three-year statute of limitations, see Gonzalez v. Bustleton Servs., 2010 U.S. Dist. LEXIS 23158, *19 (E.D. Pa. Mar. 5, 2010).

Defendants filed a motion to dismiss Plaintiff's complaint on August 17, 2018 arguing that Plaintiff did not plead sufficient facts to allege that Defendants were joint employers.  See Doc. 16.  The Court held a preliminary pretrial conference on November 16, 2018 and following the conference issued an Order denying Defendants' motion to dismiss without prejudice to re-file the motion after the close of discovery.  See Doc. 30.

On September 7, 2018, Plaintiff filed a motion for conditional certification of the FLSA

collective pursuant to 29 U.S.C. § 216(b).  See Doc. 19.  The parties subsequently agreed to stipulate to conditional certification, see Doc. 28, which the Court approved and adopted on November 16, 2018, see Doc. 31.  Thereafter, the Court-approved notice packet was mailed to each of the individuals covered by the Court's conditional certification order.  This packet also included a consent form and a postage-paid return envelope bearing Plaintiff's counsel's address. At the close of the opt-in period, the FLSA collective consisted of 15 opt-ins including Plaintiff. See Docs. 35-37, 39-42.

Following the close of the opt-in period, the parties embarked on discovery.  Plaintiff served additional written discovery seeking payroll and timekeeping data for the 15-person collective and also the members of the proposed Rule 23 class.

In response, Defendants produced payroll and timekeeping data for Plaintiff and the putative class/collective members for the relevant time period between June 6, 2015 (three years prior to Plaintiff's filing of the complaint) and July 1, 2017 (when Defendants changed the payroll practice being challenged in this lawsuit).  The parties also jointly retained a third-party accounting firm to analyze the payroll and timekeeping data in order to calculate the potential unpaid overtime pay owed to the 80 putative class/collective members.  The accounting firm produced a report that calculated $641,438 in potential unpaid overtime pay owed to the 80 putative class/collective members.

With this information, the parties engaged in arms-length settlement negotiations during a settlement conference before Your Honor on March 14, 2019.  The parties reached an agreement in principle to resolve this matter and then executed the written settlement agreement and accompanying documents ("Agreement").  See Doc. 49-2.

**B.      The Agreement.**

The Agreement's material terms are briefly summarized below.

**1.      The Settlement Class/Collective.**

For purposes of settlement only, the parties have agreed to certification of a class

pursuant to Federal Rule of Civil Procedure 23 consisting of Plaintiff and 77 other employees[4]

who were employed by Defendants between June 6, 2015 and July 1, 2017.  These individuals

are identified in Exhibit A.  See Doc. 49-1.  This proposed class includes the 14 other employees

who previously consented to join the conditionally certified FLSA collective.

**2.      The Monetary Payments.**

Defendants have agreed to create a total settlement fund of $280,000.  See Agreement at

¶ 4 (defining "Maximum Settlement Amount").  No portion of this payment will revert to

Defendants.

If the Court approves the requested service award and attorneys' fees/expenses, the net

settlement fund distributed to the class/collective will total $173,500.  This amount will be

distributed to class/collective members who do not exclude themselves and will be based on

his/her *pro rata* share – the percentage of which will differ depending upon whether they joined

the FLSA collective and whether they solely worked the unpaid overtime hours in Pennsylvania -

of the alleged unpaid overtime pay.

The proposed allocation to each class/collective member is provided at Exhibit A.[5]  See

Doc. 49-1.  Under this allocation, the payments will range between $25.43 and $25,532.85, with

---

[4] Three employees of Lourdes and St. Francis Trenton opted in to the FLSA collective, but
because they worked exclusively outside of Pennsylvania and the PMWA does not apply to
them, they are not included in the PMWA Class.

[5] The previous allocation attached as Exhibit A to the Agreement, see Doc. 49-2, was for the 80
individuals covered by the settlement.  However, this allocation has been updated to account for
the two exclusion requests.  See Doc. 49-1.

a median payout of $1,220.69 and an average payout of $2,224.36.  The allocation will provide a base payment of $25 to all employees covered by this settlement.  The remaining $173,500.00[6] payment to the class/collective will be allocated as follows:  (i)  Plaintiff and the 14 opt-ins who affirmatively joined this lawsuit will receive 45% of their possible unpaid overtime pay;[7] (ii) the 26 class members whose unpaid overtime results from having worked at 2 RHMs located in Pennsylvania will receive 30% of their possible unpaid overtime pay;[8] and (iii) the 37 class members whose unpaid overtime results from having worked, in part, at a RHM located outside of Pennsylvania, will receive 15% of their possible unpaid overtime pay.[9]  These net payments represent more than 27% of the $641,438.00 in potential overtime wages owed to the class/collective under the FLSA/PMWA.

In addition, subject to Court approval, $10,000 will be distributed to the named Plaintiff as a service award in recognition of his efforts on behalf of the class/collective, see Agreement (Doc. 49-2) at ¶ 11, and $70,000 will be paid to Plaintiff's counsel for attorneys' fees and $26,500 for litigation expenses, see id. at ¶ 10.  The requested fees for Plaintiff's counsel total 25% of the total settlement fund.  Moreover, any disapproved service awards, fees, or expenses will be allocated to members of the putative class/collective.  See id. at p. 2 (defining "Payment Amount").

### 3.     The Release

In exchange for the above consideration, class/collective members who do not exclude themselves from the settlement will release Defendants from all claims arising between June 6,

---

[6] These net payments represent more than 27% of the $641,438.00 in potential overtime wages owed to the class/collective under the FLSA/PMWA.
[7] These individuals are designated as "OI" in Exhibit A.  See Doc. 49-1.
[8] These individuals are designated as "CML" in Exhibit A.  See id.
[9] These individuals are designated as "CM" in Exhibit A.  See id.

2015 and July 1, 2017 asserted in or reasonably related to the Action, including, but not limited to, all such claims seeking unpaid overtime wages under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, the Pennsylvania Minimum Wage Act, 43 P.S. §§ 333.101, *et seq.*, the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*, or any other federal, state, or local statute, regulation, ordinance, or common law theory seeking unpaid wages or any associated penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable or other relief.  See Agreement at p. 2 (defining "Released Claims") and ¶ 5.  Importantly, the release only concerns claims between the time period of June 6, 2015 and when Defendants stopped the payroll practice challenged in this lawsuit on July 1, 2017.

## III.   PRELIMINARY APPROVAL AND THE SUBSEQUENT NOTICE PROCESS TO THE CLASS/COLLECTIVE.

### A.   The Court Preliminarily Approves the Settlement.

On May 24, 2019, Plaintiff filed an "Unopposed Motion for Preliminary Approval of the Class Action Settlement and Other Related Relief."  See Docs. 45-46.  On May 31, 2019, the Court entered an order: (i) preliminarily approving the settlement; (ii) approving the class Notice form and protocols; (iii) appointing Winebrake & Santillo, LLC to serve as interim Class Counsel; and (iv) scheduling an in-person fairness hearing.  See Doc. 47.

### B.   The Court-Approved Notice Process.

In accordance with the Agreement and the Court's May 31, 2019 preliminary approval order, Winebrake & Santillo, LLC ("W&S") mailed copies of the Notices to the 80 class/collective members *via* first class mail on July 24, 2019.  See Declaration of Mark J. Gottesfeld ("Gottesfeld Dcl.") (Doc. 49-3) at ¶ 24.  One Notice was returned by the USPS with a forwarding address and the Notice was re-mailed to the forwarding address.  See id.  Two

Notices were returned by the USPS as undeliverable and W&S performed a locator trace for each of these individuals and obtained new addresses for both of these individuals and re-mailed their copy of the Notice.  See id.

The postmark deadline for class members to submit requests for exclusions or objections to the settlement was July 26, 2019.  See id. at ¶¶ 25-26.  To date, *zero class members have objected to the settlement*.  See id. at ¶ 26.  Only two individuals, Deborah Marsden and Renate Pohl, submitted a request to be excluded from the settlement.  See id. at ¶ 25; Doc. 48.

## IV.     ARGUMENT

### A.     The Court Should Certify the Class.

The settlement of a putative class action lawsuit does not eliminate the need to certify the class.  See generally Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997).  To obtain class certification, Plaintiff must satisfy Rule 23(a)'s four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  See Reyes v. Netdeposit, LLC, 802 F.3d 469, 482 (3d Cir. 2015).  Next, he must satisfy Rule 23(b)(3)'s two additional requirements: (5) common questions of law or fact must "predominate over any questions affecting only individual members" and (6) "a class action [must be] superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

As discussed below, Plaintiff satisfies each class certification requirement:

*Numerosity:*  Civil Rule 23(a)(1)'s numerosity requirement is satisfied where a class is "so numerous that joinder of all members is impracticable."  Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 595 (3d Cir. 2012).  Here, numerosity is met because the class includes 78 individuals, making joinder impracticable.

*Commonality:*  The commonality "bar is not a high one," Rodriguez v. National City

Bank, 726 F.3d 372, 382 (3d Cir. 2013), and "is easily met," Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Commonality "does not require perfect identity of questions of law or fact among all class members." Reyes, 802 F.3d at 486. Since "'even a single common question will do,'" commonality is satisfied if "'plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" Id.

Here, the commonality requirement is satisfied because, *inter alia*, each of the proposed class/collective members was subject to the same payroll policy at issue in this lawsuit – Defendants' common policy of only paying employees overtime compensation when they worked over 40 hours at a single RHM. This is precisely the type of across-the-board pay practice that establishes commonality.

*Typicality:* Civil Rule 23(a)(3)'s typicality requirement "is intended to assess whether the action can be efficiently maintained as a class action and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57. Lawsuits challenging the same conduct which "affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Baby Neal, 43 F.3d at 58. "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." Id.

Here, typicality exists because Plaintiff and every class member shares the same interest of recovering unpaid wages from Defendants based on Plaintiff's challenge to their alleged improper payroll practices. In sum, Plaintiff's interests and basic legal theory are entirely aligned with those of the other employees covered by this lawsuit.

*Adequacy:* This requirement is satisfied if both: "(a) the plaintiff's attorney [is]

14

qualified, experienced, and generally able to conduct the proposed litigation, and (b) the Plaintiff [does] not have interests antagonistic to those of the class," <u>Weiss v. York Hospital</u>, 745 F.2d 786, 811 (3d Cir. 1984) (internal quotations omitted).

Here, adequacy is satisfied. First of all, Plaintiff's counsel are experienced employment rights lawyers who have handled hundreds of federal court actions concerning our Nation's wage and overtime laws. <u>See</u> <u>generally</u> Gottesfeld Dcl. (Doc. 49-3) at ¶¶ 3-17. Moreover, Plaintiff does not have any interests that are antagonistic to the class. As already noted, his interests are entirely aligned with other class members.

*Predominance:* Civil Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Supreme Court summarized the predominance test as follows:

> The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

<u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S. Ct. 1036, 1045 (2016) (internal citations omitted).

Here, predominance is satisfied because the success or failure of Plaintiff's challenge to Defendants' common payroll practice will turn on this Court's application of common legal principles to a common set of facts. <u>See</u> p. 14 *supra* (addressing "commonality"). In this regard, this lawsuit is actually *more* cohesive than <u>Bouaphakeo</u>, where the Supreme Court found predominance satisfied in a case in which hundreds of employees (who worked in different job titles and departments and some of whom might not have suffered any actual damages) challenged a company's timekeeping and payroll practices. <u>See</u> 136 S. Ct. at 1042-44.

15

***Superiority:***   Civil Rule 23(b)(3) also requires the Court "to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication," In re Prudential Insurance Company America Sales Practice Litig., 148 F.3d 283, 316 (3d Cir. 1998), and "sets out several factors relevant to the superiority inquiry," id. at 315-16.  As discussed below, these factors favor class certification:

First, Civil Rule 23(b)(3)(A) requires courts to consider class members' "interests in individually controlling the prosecution or defense of separate actions."  This requirement is intended to protect against class certification where individual class members possess a strong interest in "individually controlling" the litigation because, for example, the individual claims are emotionally charged or involve significant damages amounts.  See William Rubenstein, Alba Conte, and Herbert B. Newberg, Newberg on Class Actions at §4:69.  Here, the legal issues do not elicit much emotion.

Second, Civil Rule 23(b)(3)(B) requires courts to consider "the extent and nature of any litigation concerning the controversy already begun by" class members.  This factor is not relevant because no related litigation exists.

Third, Civil Rule 23(b)(3)(C) reviews the desirability of "concentrating the litigation of the claims in a particular forum."  Fed. R. Civ. P. 23(b)(3)(C).  Here, concentration of all claims in this Court is desirable because all of the class/collective members worked at a medical facility in the tri-state area.

Fourth, Civil Rule 23(b)(3)(D) requires the court to consider any "likely difficulties in managing the class action."  Fed. R. Civ. P. 23(b)(3)(D).  This requirement is automatically satisfied when a case is certified for settlement purposes.  See Amchem, 521 U.S. at 620.

***Summary:***  In sum, the settlement class should be certified because all of Rule 23's class

certification requirements are satisfied.

**B.    The Court Should Approve the $173,500 Payment to Class Members as "Fair, Reasonable, and Adequate."**

While courts should be mindful that "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation," In re General Motors Pick-Up Truck Fuel Tank Products Liability Litig., 55 F.3d 768, 784 (3d Cir. 1995), they also must ensure that class action settlements are "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e); see also Ehrheart v. Verizon Wireless, 609 F.3d 590, 592 (3d Cir. 2010) ("In evaluating a class action settlement under Rule 23(e), a district court determines whether the settlement is fundamentally fair, reasonable, and adequate.").

On December 1, 2018, Civil Rule 23 was amended to add uniform criteria that district courts should consider in deciding whether to approve a class action settlement as fair, reasonable and adequate,[10] and provides:

> (2) ***Approval of the Proposal***. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
> (A)  the class representatives and class counsel have adequately represented the class;
> (B)  the proposal was negotiated at arm's length;
> (C)  the relief provided for the class is adequate, taking into account:
>    (i)    the costs, risks, and delay of trial and appeal;
>    (ii)   the effectiveness of any proposed method of distributing relief to the

---

[10] Prior to the 2018 amendments, Pennsylvania district courts had relied on the nine factors articulated by Third Circuit in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) to determine whether to approve a class action settlement under Rule 23. See, e.g., Pacheco v. Vantage Foods, Inc., 2016 U.S. Dist. LEXIS 16709, *2 (M.D. Pa. Feb. 11, 2016) (Conner, C.J.). However, as the Eastern District of Pennsylvania recently observed: "The Girsh factors predate the recent revisions to Rule 23, which now explicitly identifies the factors that courts should apply in scrutinizing proposed class settlements, and the discussion in Girsh substantially overlaps with the factors identified in Rule 23." Hall v. Accolade, Inc., 2019 U.S. Dist. LEXIS 143542, *5-6 n.1 (E.D. Pa. Aug. 22, 2019).

class, including the method of processing class-member claims;
 (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
 (iv) any agreement required to be identified under Rule 23(e)(3); and
 (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Each of these factors is addressed below:

  ***Rule 23(e)(2)(A) – Plaintiff and class counsel "have adequately represented the class":***

This factor is satisfied because, prior to settlement, Defendants produced payroll and timekeeping data for Plaintiff and the putative class/collective members for the relevant time period.  Moreover, the parties jointly retained an accounting firm to analyze the payroll and timekeeping data in order to calculate the potential unpaid overtime pay owed to the 80 putative class/collective members.  The accounting firm produced a report that the parties relied upon in determining that the potential unpaid overtime pay owed to the 80 putative class/collective members totaled $641,438.  These efforts provided class counsel with "an adequate appreciation of the merits of the case before negotiating."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004).

  ***Rule 23(e)(2)(B) – The settlement was "negotiated at arm's length":***  This factor is satisfied because the settlement was achieved through arm's-length negotiations that occurred during a Settlement Conference on March 14, 2019 before Your Honor.  Moreover, the settlement bears none of the hallmarks a collusive settlement.  "The participation of an independent mediator in settlement negotiations virtually ensures that the negotiations were conducted at arm's length and without collusion between the parties."  Hall, 2019 U.S. Dist. LEXIS 143542, *9-10 (internal quotations omitted).

  ***Rule 23(e)(2)(C)(i) – The "costs, risks, and delay of trial and appeal":***  This factor "balances the relief that the settlement is expected to provide to class members against the cost

and risk involved in pursuing a litigated outcome." Hall, 2019 U.S. Dist. LEXIS 143542, *10

(internal quotations omitted).  While such forecasting "cannot be done with arithmetic accuracy,

. . . it can provide a benchmark for comparison with the settlement figure." Id.; accord In re

Baby Products Antitrust Litig., 708 F.3d 163, 173-74 (3d Cir. 2013) ("The role of a district court

is not to determine whether the settlement is the fairest possible resolution—a task particularly

ill-advised given that the likelihood of success at trial (on which all settlements are based) can

only be estimated imperfectly.").  Here, this factor is satisfied for the following reasons:

First, absent settlement, the costs and delays associated with this litigation would be

significant.  The Court would be required to resolve extensive and contested motions, including

Plaintiff's motion for certification of the Rule 23 class and Defendants' anticipated motions for

summary judgment and decertification of the FLSA collective.  Moreover, if the case proceeded

to trial as a class or collective action, the Court would be presented extensive briefing regarding

the scope and propriety of "representative" evidence and testimony concerning Defendants'

payroll practices.  In sum, continued adversarial litigation would be a long, complicated, and

expensive process for the parties and the Court.

With respect to litigation risk, the Court is respectfully referred to section I.B., *supra*.  As

explained therein, there is the potential that Defendants could either win or substantially limit

their potential exposure.

***Rule 23(e)(2)(C)(ii) – The "effectiveness of any proposed method of distributing relief***

***to the class including the method of processing class-member claims if required":***  Under this

factor, the court "scrutinize[s] the method of claims processing to ensure that it facilitates filing

legitimate claims" and "should be alert to whether the claims process is unduly demanding."

Hall, 2019 U.S. Dist. LEXIS 14352, at *11.  Here, this factor is satisfied because class members

are not required to file claim forms in order to receive a settlement payment.  <u>See</u> Agreement

(Doc. 45-1) at ¶ 9.

  ***Rule 23(e)(2)(C)(iii) – The "terms of any proposed award of attorney's fees, including***

***the timing of payment":***  This factor supports approval because the settlement is not contingent

on the Court's approval of class counsel's requested fee, any disapproved fees will be distributed

to the class members.  <u>See</u> Agreement (Doc. 49-2) at ¶ 10.  Moreover, as discussed in section

IV.F., *infra*, the requested fee equals 25% of the settlement fund, which is in line with the

percentage fee recovered in many other class/collective actions within the Third Circuit.  <u>See</u>

<u>Mabry v. Hildebrandt</u>, 2015 U.S. Dist. LEXIS 112137, *9 (E.D. Pa. Aug. 24, 2015) ("the

recovery award in FLSA common fund cases ranges from roughly 20-45%"); <u>Creed v. Benco</u>

<u>Dental Supply Co.</u>, 2013 U.S. Dist. LEXIS 132911, *17 (M.D. Pa. Sept. 17, 2013) (observing in

overtime rights class action that "an award of one-third of the settlement is consistent with

similar settlements throughout the Third Circuit").

  ***Rule 23(e)(2)(C)(iv) – "Any agreement required to be identified under Rule 23(e)(3)":***

There are no other contracts besides the Agreement.

  ***Rule 23(e)(2)(D) – The proposal treats class members "equitably relative to each***

***other":***  This factor seeks to prevent the "inequitable treatment of some class members *vis-a-vis*

others."  Advisory Committee Notes.  As discussed in section II.B.2., *supra*, the net settlement of

$173,500.00[11] will be distributed as follows:  All individuals covered by the settlement will

receive a base payment of $25.  The remaining $173,500.00 payment to the class/collective will

be allocated as follows: (i) Plaintiff and the 14 opt-ins who affirmatively joined this lawsuit will

---

[11] The class/collective members' gross settlement payments will be reduced for taxes and
withholdings ordinarily borne by employees. Those taxes and withholdings ordinarily borne by
employers will be paid separately by Defendants and will not come out of the $173,500 net
settlement amount.

receive 45% of their possible unpaid overtime pays[12]; (ii) the 26 class members whose unpaid

overtime results from having worked at 2 RHMs located in Pennsylvania will receive 30% of

their possible unpaid overtime pay[6]; and (iii) the 37 class members whose unpaid overtime

results from having worked, in part, at a RHM located outside of Pennsylvania, will receive 15%

of their possible unpaid overtime pay.[13]

 The enhanced allocation formula for members of the FLSA collective is justified by two

factors:

 First, if Plaintiff was fortunate to ultimately prevail in this matter, members of the FLSA

collective could potentially recover liquidated (or double damages) damages pursuant to 29

U.S.C. § 260.  However, liquidated damages are not available under the PMWA.  See Gonzalez

v. Bustleton Servs., 2010 U.S. Dist. LEXIS 43773 (E.D. Pa. May 5, 2010).

 Second, if the Court granted Defendants' anticipated motion for decertification, the

claims of FLSA collective members would be dismissed without prejudice and they would be

free to initiate individual lawsuits against Defendants.  See Halle v. W. Penn Allegheny Health

Sys., 842 F.3d 215, 226 (3d Cir. 2016).  Members of the Rule 23 class, however, would only be

covered by this litigation if the Court were to grant Plaintiffs anticipated class certification

motion under the PMWA.  As discussed in section I.B., supra, such a motion would be heavily

contested.

 Also, the enhanced allocation for the 26 class members whose unpaid overtime results

from having worked at 2 RHMs located in Pennsylvania versus the 37 class members whose

unpaid overtime results from having worked, in part, at a RHM located outside of Pennsylvania,

is justified in light of the argument, as summarized by Defendants' counsel, that only class

---

[12] These individuals are designated as "OI" in Exhibit A.  See Doc. 49-1.

[13] These individuals are designated as "CM" in Exhibit A to the Settlement Agreement.  See id.

members who worked at both Mercy and St. Mary would be proper members of the putative

PMWA class.  See pp. 7-8, supra.  Specifically, Defendants argue that:

> Plaintiff's proposed PMWA claim also would fail, at least in part, to
> the extent that it seeks to recover damages on behalf of employees
> for hours that they worked outside of the Commonwealth of
> Pennsylvania at: Lourdes (which is solely located in New Jersey),
> St. Francis Medical Center ("St. Francis Trenton"), (which is solely
> located in New Jersey), and/or and St. Francis Hospital, Inc. ("St.
> Francis Delaware") (which is solely located in Delaware). The
> PMWA is inapplicable to, and Plaintiff and the other 79 employees
> may not recover under the PMWA, for hours worked outside of
> Pennsylvania.  To allow New Jersey or Delaware employees to seek
> payment of alleged unpaid overtime under the PMWA for work
> performed outside of Pennsylvania that benefited a non-
> Pennsylvania based employer is not supported by case law and
> would violate the U.S. Constitution's Commerce Clause prohibition
> that a state may not by its laws directly affect, bind, or operate upon
> property or persons beyond its territorial jurisdiction. Accordingly,
> even if Plaintiff and the other 79 employees would have been
> successful as to their PMWA claim, only those employees who
> worked at both Mercy and St. Mary (i.e., the only 2 RHMs located
> in Pennsylvania) are proper members of the putative PMWA class.

See id.

   **Summary:**  Each of the Rule 23(e)(2) factors favor approval of the $173,500 payment to

the class members as "fair, reasonable, and adequate."

### C.    The Court Should Approve Class Members' Release of their FLSA Claims.

   Although the Third Circuit has not yet addressed the issue, it is well accepted that FLSA

settlements not supervised by the U.S. Department of Labor must be approved by the Court as

"'a fair and reasonable resolution of a *bona fide* dispute over FLSA provisions.'"  Shimp v.

Wildcat, LLC, 2016 U.S. Dist. LEXIS 52522, *3 (M.D. Pa. Apr. 20, 2016) (Conner, C.J.).  In

this regard, an FLSA settlement will be approved if it: (1) resolves a *bona fide* dispute under the

FLSA; (2) is "fair and reasonable to the plaintiff employee;" and (3) "furthers or 'impermissibly

frustrates' implementation of FLSA in the workplace.'"  Id. at *4.  As is discussed below, each

of these requirements is satisfied.

### 1.  The Settlement Resolves a *Bona Fide* Dispute.

"A *bona fide* dispute is one in which there is some doubt whether the plaintiff would succeed on the merits at trial" concerning "factual rather than legal doubt."  Shimp, 2016 U.S. Dist. LEXIS 52522, at *7.  As stated above, had this matter not been settled there were several factual issues concerning whether Plaintiff and the class could prove that Defendants' payroll practices violated federal law.

### 2.  The Settlement is Fair and Reasonable.

Here, the settlement is "fair and reasonable" because, notwithstanding the risks discussed above, members of the FLSA collective will receive, after attorney's fees and costs, 45% of their possible unpaid overtime pay.  Based on the various litigation risks discussed above, this represents a good result.

### 3.  The Settlement Furthers the FLSA's Implementation.

FLSA settlements run afoul of this requirement when they contain, *inter alia*, confidentiality agreements, possess overly-broad release language, or are filed under seal.  See Shimp, 2016 U.S. Dist. LEXIS 52522, at, *10 (citing cases).  This settlement suffers from no such deficiencies.

### D.  The Requested Service Awards Warrants Approval.

As the Third Circuit has recognized, service awards are not uncommon in class or collective action litigation because the "purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred ruing the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws."  Sullivan v. DB Invs., Inc., 667 F.3d 273, 333 n.65 (3d Cir. 2011).  In addition,

courts have recognized named plaintiffs in class/collective litigation risk potential ramifications with not only their current employer, but also potentially with future employers.  See Scovil v. FedEx Ground Package Sys., 2014 U.S. Dist. LEXIS 33361, *26 (D. Me. Mar. 14, 2014) ("The reason commonly given for the higher awards in these cases is the fear and risk of retaliation and embarrassment in the workplace."); Edelen v. Am. Residential Servs., LLC, 2013 U.S. Dist. LEXIS 102373, *46-47 (D. Md. July 22, 2013) ("although there is no indication that [the named plaintiff] faces any specific challenges in his current or future job prospects as a result of his participation in this lawsuit, there clearly is a risk that he could").

Thus, it is not unusual for initiating plaintiffs in employment lawsuits within the Third Circuit to receive significant service awards in recognition of their efforts on behalf of the entire class/collective.  See, e.g., Craig v. Rite Aid Corp., 2013 U.S. Dist. LEXIS 2658, *50 (M.D. Pa. Jan. 7, 2013) (service awards in the Third Circuit "have ranged from $1,000 up to $30,000.").  The Agreement allows Plaintiff to seek a service award of $10,000 . See Agreement (Doc. 49-2) at ¶ 11.  This service award should be approved because it is well within the range previously approved by this Court.  Moreover, no class member has objected to the proposed service award even though they were clearly disclosed in the Notice.  See Gottesfeld Dcl. (Doc. 49-3) at ¶ 26.

### E.    Winebrake & Santillo, LLC Should be Appointed Permanent Class Counsel.

A Court certifying a class must also appoint class counsel.  See Fed. R. Civ. P. 23(g)(1). In making this appointment, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]"  Id. at 23(g)(1)(A).  As discussed below, each of these factors favors the permanent

appointment of Winebrake & Santillo, LLC ("W&S") to serve as class counsel:

> *Rule 23(g)(1)(A)(i) – "The work counsel has done in identifying or investigating potential claims in the action":*  This factor favors appointment of W&S because "this is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own."  In re Gulf Oil/Cities Serv. Tender Litig., 142 F.R.D. 588, 597 (S.D.N.Y. 1992).

> *Rule 23(g)(1)(A)(ii) – "Counsel's experience handling class actions, other complex litigation, and the types of claims asserted in the action":*  This factor favors appointment because W&S has handled and resolved hundreds of wage and hour lawsuits on both an individual and a class-wide basis.  See Gottesfeld Dcl. (Doc. 49-3) at ¶¶ 3-6.

> *Rule 23(g)(1)(A)(iii) – "Counsel's knowledge of the applicable law":*  This factor favors appointment because, as indicated by this litigation, W&S is quite knowledgeable of the underlying legal claims.  W&S attorneys also regularly lecture on wage and hour law.  See Gottesfeld Dcl. (Doc. 49-3) at ¶¶ 10, 13, 17.

> *Rule 23(g)(1)(A)(iv) – "The resources that counsel will commit to representing the class":*  This factor favors appointment because W&S has already committed over 192.5 attorney and staff hours to this litigation.  See Gottesfeld Dcl. (Doc. 49-3) at ¶ 22.

*Summary:*  Each Rule 23(g)(1)(A) factor favors W&S's appointment as class counsel.

## F.    The Requested Attorney's Fees of $70,000 Warrant Approval.

The settlement contemplates $70,000 in requested attorney's fees and $26,500 in litigation expenses.  See Agreement (Doc. 49-2) at ¶¶ 22-23.  The attorney's fee payment of $70,000 equals **25%** of the $280,000 settlement fund.

### 1.    The Preferred "Percentage of the Fund" Method Favors Approval.

The "percentage of the fund" method of reviewing class action fee requests "is generally favored . . . because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005).

Here, a "percentage of the fund" analysis favors approval because the $70,000 fee equals 25% of the settlement fund.  As discussed below in the context of the seventh Gunter factor, such a percentage recovery is within the range of recoveries that have been approved in other wage and hour class/collective action settlements in this Circuit.

### 2.    The **Gunter**/**Prudential** Factors Favor Approval.

Moreover, in evaluating the reasonableness of class counsel's request for a fee equaling 25% of the settlement fund, the Court is expected to consider the seven factors described by the Third Circuit in Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000), and the three additional factors described by the Third Circuit in In re Prudential Insurance Company America Sales Practice Litig., 148 F.3d 283 (3d Cir. 1998).  See In re AT&T Corp. Sec. Litig., 455 F.3d 160, 165-66 (3d Cir. 2006).   As discussed below, a review of these factors favor approval of the requested fee:

***Gunter* Factor 1 – The Size of the Fund Created and the Number of Persons Benefited**: This factor favors approval because the settlement enables the 78 class/collective members to share in $173,500 free and clear of fees, expenses, and the service award.  Specifically, Plaintiff and the 14 opt-ins who affirmatively joined this lawsuit will receive 45% of their possible unpaid overtime pay, the 26 class members whose unpaid overtime results from having worked at 2 RHMs located in Pennsylvania will receive 30% of their possible unpaid overtime pay, and the 37 class members whose unpaid overtime results from having worked, in part, at a RHM located

outside of Pennsylvania, will receive 15% of their possible unpaid overtime pay.  This constitutes a good result.

*Gunter* **Factor 2 – The Presence or Absence of Substantial Objections by Members of the Class**:  This factor favors approval because no class member has objected to the proposed fees and expenses even though they were clearly disclosed in the Court-approved Notice.  See Gottesfeld Dcl. (Doc. 49-3) at ¶ 26.

*Gunter* **Factor 3 – The Skill and Efficiency of the Attorneys Involved**:  This factor favors approval because, as already discussed, class counsel is well-recognized as skilled wage and hour litigators.  See Gottesfeld Dcl. (49-3) at ¶¶ 3-17.  Moreover, class counsel has efficiently brought this matter to a fair and favorable resolution.

*Gunter* **Factor 4 – The Complexity and Duration of the Litigation**:  This factor favors approval because, in the absence of settlement, this litigation would entail a series of complex litigation events, including, *inter alia*, a motion to certify the Rule 23 class, a motion to "decertify" the FLSA collective, summary judgment motions, expert damages reports, and expert discovery.

*Gunter* **Factor 5 – The Risk of Nonpayment**:  This factor favors approval because class counsel *always* works on a pure contingency fee basis, see Gottesfeld Dcl. (49-3) at ¶ 3, making non-payment a real risk.  See In re Lucent Tech., Inc., 327 F. Supp. 2d 426, 438 (D.N.J. 2004).

*Gunter* **Factor 6 – The Amount of Time Devoted to the Case**:  Class counsel has invested over 192.5 attorney hours and staff hours on this litigation.  See Gottesfeld Dcl. (Doc. 49-3) at ¶ 22.  Such a substantial time investment favors approval.

*Gunter* **Factor 7 – The Awards in Similar Cases**:  This factor favors approval because the requested fee equals 25% of the total settlement fund is within the range of fee awards

approved in other class/collective wage and hour actions.  See Mabry, 2015 U.S. Dist. LEXIS

112137, at *9 ("the recovery award in FLSA common fund cases ranges from roughly 20-45%");

Creed, 2013 U.S. Dist. LEXIS 132911, at *17 (observing that "an award of one-third of the

settlement is consistent with similar settlements throughout the Third Circuit").

> ***Prudential* Factor 1 – *Value of benefits attributable to class counsel as opposed to the efforts of other groups such as governmental agencies***:  This factor favors approval because no other groups or governmental agencies have brought parallel actions or investigations.

> ***Prudential* Factor 2 – *Percentage of fee that would have been negotiated had the case been subject to a private contingent fee agreement***:  As Middle District Judge John Jones observed in another wage/overtime class action, contingency fees in this region of the country generally range between 30% and 40%.  See Craig, 2013 U.S. Dist. LEXIS 2658, at *47.  As such, this factor favors approval of the 25% fee recovery sought here.

> ***Prudential* Factor 3 – *Any innovative terms of settlement***:  None of the settlement terms can be characterized as particularly "innovative" so this factor is neutral.

> ***Summary of the* Gunter *and* Prudential *Factors***:  In sum, all but one of the Gunter and Prudential factors favor approval of the requested attorney's fee.

### 3.    The Lodestar Crosscheck Favors Approval.

While not required, judges awarding fees under the percentage of recovery method may

perform a "lodestar crosscheck" in order to ensure that class counsel are not getting too great a

windfall for their representation of the class.  See Rite Aid, 396 F.3d at 305-07.  Here, based on

the hourly rates described in the fee schedule published by Community Legal Services of

Philadelphia, class counsel's lodestar as of October 16, 2019 was $101,596 which is more than

the proposed $70,000 fee award.  See Gottesfeld Dcl. (49-3) at ¶¶ 20-22.

**G.      The Requested Costs of $26,500 Warrant Approval.**

In addition, class counsel has incurred a total of approximately $26,500 in costs and settlement administration fees.  <u>See</u> Gottesfeld Dcl. (Doc. 49-3) at ¶ 23.  All of these expenses are reasonable and warrant approval.

**V.      CONCLUSION**

For the above reasons, the Court should approve the settlement and enter the accompanying proposed order.

Dated:  October 21, 2019                           Respectfully,

<u>/s/ Mark J. Gottesfeld</u>
Peter Winebrake
R. Andrew Santillo
Mark J. Gottesfeld
Winebrake & Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491

*Class Counsel*